[Crim. No. 2613. In Bank.—May 9, 1924.]

## THE PEOPLE, Respondent, v. MARTIN SLISCOVICH, Appellant.

[1] CRIMINAL LAW—SCENE OF HOMICIDE—PHOTOGRAPHS—EVIDENCE.— In a prosecution for murder, photographs taken several months after the homicide which portrayed the kitchen where the homicide occurred and indicated the location of certain objects which were in the room at the time of the homicide were admissible in evidence as a diagram or illustration of the premises, where the purpose of the introduction of the photographs was to show the different doors leading into the kitchen and also the relative position of three persons seated in the room at the time of the shooting, and for illustrative purposes it was not necessary that the room should have been reproduced with absolute fidelity so as to include unimportant objects.

[2] ID.—INSANITY—EVIDENCE.—Where the defense is insanity and the claim of the defendant is that certain things had been told him which so affected his mind that at the time of committing the murder he was insane, the test is not whether the facts claimed

---

1. Use of photographs of places as evidence, notes, 75 Am. St. Rep. 468; 114 Am. St. Rep. 437; 35 L. R. A. 808; 51 L. R. A. (N. S.) 853.
2. Measure of proof of insanity in criminal case, note, 39 L. R. A. 737.

to have been told to the defendant and relied upon as a cause of the defendant's insanity were true or false. The real test is whether the defendant was in fact told the things which he claims caused his insanity, and what effect, if any, they had on his mind.

[3] ID.—EVIDENCE.—The fact that the things claimed to have been related to the defendant did not actually occur is not proof that the things were not related to the defendant.

[4] ID.—INSANITY—ERRONEOUS ADMISSION OF EVIDENCE—ABSENCE OF PREJUDICE.—In such prosecution, the defendant having testified in effect that certain things had been told him which so affected his mind that at the time of committing the murder he was insane, which testimony was corroborated by another witness, the erroneous admission of evidence offered by the prosecution in an attempt to show that the things related to defendant did not actually occur was not so prejudicial to defendant as to require a reversal, where the testimony given by the prosecution witnesses had but little tendency to impair the credibility of the defendant's testimony and that of his witness in corroboration of him.

[5] ID.—INSANITY—EVIDENCE—FINDINGS.—In such prosecution, the statements claimed to have been made to the defendant, i. e., that a colored plasterer had been poisoned by indulgence in whisky at the home of the deceased, and that another man who had indulged in such liquor was robbed of a sum of money, not being statements of the nature that would ordinarily affect the mind of a man to the point of rendering him insane, the jury may well have so found, even though they had further found that the statements in question had in fact been made to the defendant.

[6] ID.—ARGUMENT—MISCONDUCT.—In such prosecution, counsel for defendant, in his argument to the jury, having said, "Men are walking to-day on the streets of Sacramento, who shot men down in cold blood, without provocation," reference by the district attorney, in reply to this statement, to a recent murder of two prominent men of that community who had been shot down in cold blood and whose murderers had not at the time of trial been apprehended, was well within the limits of legitimate reply; and the argument of the district attorney having been provoked and invited by counsel for the defendant, it cannot on appeal be assigned and relied upon as misconduct requiring a reversal of the case.

[7] ID.—MISCONDUCT.—In such prosecution, with reference to other portions of the argument of the district attorney wherein it is complained that he was guilty of misconduct in his comments upon the character and personality of a witness for the defense, it cannot be said, as is contended, that the district attorney exceeded the bounds of legitimate argument.

193 Cal.—35

[8] ID.—EVIDENCE—WITNESSES—SECTION 2049, CODE OF CIVIL PRO-
CEDURE—PURPOSE OF.—While it is true that under the provisions
of section 2049 of the Code of Civil Procedure a party producing
a witness may show that the witness had made statements at other
times inconsistent with the testimony as given upon the witness-
stand, still the privilege permitted by this section may not be
invoked on every occasion, the purpose of the provisions of said
section being to permit a party who has, in good faith, produced
a witness upon the stand in the belief that the witness will give
certain testimony in support of the party calling him to show
that prior to being called to the witness-stand the witness made
statements which, if admitted in evidence, would have been favor-
able to the party calling the witness.

[9] ID.—EVIDENCE—CONTRADICTING OWN WITNESS.—To entitle a party
to contradict his own witness by showing statements elsewhere
made and contrary to those made upon the witness-stand, it must
appear not only that the party was surprised by the testimony of
the witness, but that such testimony was prejudicial to the case
of the party calling the witness. Therefore, the mere failure of a
witness to testify favorably for the party calling him, unac-
companied by any testimony which would tend to the prejudice
of the case of the party calling the witness, will not entitle such
party to show that the witness has elsewhere made contrary state-
ments concerning the facts sought to be elicited from him.

[10] ID.—EVIDENCE—SECTION 2049, CODE OF CIVIL PROCEDURE.—In
such prosecution, the substance of the testimony of a witness for
the defendant having consisted of a denial that he had had cer-
tain conversations with the defendant concerning the deceased
previous to the homicide, and therefore not having testified to
anything that was prejudicial to the defendant and the defend-
ant's case, the defendant was not privileged to invoke the provi-
sions of section 2049 of the Code of Civil Procedure.

[11] ID.—EVIDENCE—MOTION TO STRIKE—ALLOWANCE OF—PROPRIETY
OF RULING.—In such prosecution, the motion to strike out the
testimony of a witness to the effect that he had told the defend-
ant that it was foolish for the defendant to go to the home of
the deceased and there spend his money "and make him crazy
with that liquor" was properly granted, the belief of the witness
that indulgence by the defendant in liquor that might be served
by the deceased would make the defendant crazy not being com-
petent or any evidence of the fact that the defendant was insane
at the time of the killing.

[12] ID. — EVIDENCE — REBUTTAL — DECLARATION OF DEFENDANT. — In
such prosecution, testimony on behalf of the people to the effect
that the defendant about ten days before the commission of the
homicide was drunk and said he was "going to kill somebody,"

given in rebuttal of defendant's testimony, embodied a relevant declaration made by the defendant and was, therefore, pursuant to the provisions of section 1870, subdivision 2, of the Code of Civil Procedure, admissible as an independent piece of evidence and, therefore, there was no need for the laying of a foundation for impeaching defendant's testimony.

[13] ID. — EVIDENCE — IMPEACHMENT — REBUTTAL.—Even though such testimony, that defendant about ten days before the commission of the homicide was drunk and said he was "going to kill somebody," had a tendency toward the impeachment of a witness for the defendant, still said testimony was in a measure rebuttal in character and, therefore, admissible, the defendant having testified in support of his defense of insanity that on the night of the homicide "everything turn black" just before the killing.

[14] ID.—LEADING QUESTIONS—DISCRETION.—In such prosecution, there was no abuse of discretion of the trial court in refusing to permit counsel for the defendant to propound leading questions, where the record shows that even though leading questions were not permitted, the testimony sought to be adduced by those questions was subsequently elicited from the witnesses by the use of simple language.

[15] ID.—EXPLANATION OF ANSWERS BY DEFENDANT—REFUSAL BY COURT.—In such prosecution, the trial court rightfully refused to permit the defendant, when testifying as a witness, to explain his answers, where the witness had fully and completely answered the questions put to him, and any explanation would be no more nor less than a volunteer statement.

[16] ID.—INTERRUPTIONS BY TRIAL COURT—EFFECT OF.—In such prosecution, it cannot be said on appeal that there is any merit in the contention that the trial court by its frequent interruptions, of its own motion, of the counsel and of the witnesses for the defense, seriously impaired and impeached the defendant's case.

[17] ID.—ARGUMENT—MISCONDUCT.—Misconduct of counsel for the defendant, in any given case, occurring at the trial, or during the argument to the jury, consisting in departing from the record and commenting upon facts and circumstances not appearing in evidence in the case, will not suffice to justify similar misconduct of the district attorney. (Opinion of supreme court, on denial of hearing.)

APPEAL from a judgment of the Superior Court of Sacramento County. Chas. O. Busick, Judge. Affirmed.

The facts are stated in the opinion of the court.

14. Permitting leading questions as matter within discretion of trial court, note, 17 Ann. Cas. 840.

Clifford A. Russell for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

LENNON, J.—The defendant in this case was charged with the crime of murder. He was found guilty of murder in the first degree and was sentenced to suffer the penalty of death. The appeal is from the judgment. Succinctly stated the facts of the case upon which the prosecution relied for a conviction are substantially these:

On the evening of November 22, 1922, between the hours of 7 and 8 o'clock, at the home of Marco Radman and his wife, Jennie Radman, located at 1618 O Street, in the city of Sacramento, Jennie Radman was shot and killed by the defendant, Martin Sliscovich. At 7 o'clock in the evening of that day a group of persons were gathered in the kitchen of Marco Radman's home. There were present Jennie Radman, John Sliscovich, Mrs. Lebedina, George Radal, Klapich, Hall, who was an automobile salesman; the defendant, Martin Sliscovich, who was a roomer at the home of Mrs. Radman; the three children of the deceased, and a little daughter of Mrs. Lebedina. Sometime between 7:30 and 8 o'clock on the evening in question, Radal, Klapich, Hall, and the defendant left the room. John Sliscovich, Mrs. Lebedina, Mrs. Radman, and the four children remained. The three adults were sitting in somewhat of a semi-circle near the stove and the children were back of them in the corner playing "school." Mrs. Lebedina was sitting near the stove; next to her was John Sliscovich, sitting between Mrs. Lebedina and Mrs. Radman; next to him was Mrs. Radman. Martin Sliscovich, the defendant, who had been drinking, returned to the room with his hat on his head and his hands in his overcoat pockets. The defendant, while walking slowly toward Mrs. Radman, who was facing him as he entered the room, fired three shots from an automatic pistol into her body. John Sliscovich was also at this time shot and killed by the defendant. The defendant then went upstairs to the room which he occupied, threw the gun upon the bed and then left the house. Search was immediately made for the defendant

by the officers of the law, but he succeeded in eluding them, and on the day following the homicide he purchased a ticket for Los Angeles. He was arrested some several months later in San Diego. There is some evidence to the effect that the defendant, Martin Sliscovich, was in love with the deceased, and that John Sliscovich, who, so far as the record shows, was no relation to the defendant, also entertained an affection for the deceased. It will be noted that the defendant, although he killed two persons, was charged only with and tried for the murder of Jennie Radman.

It is conceded that the evidence is sufficient to support the verdict and judgment. It is contended, however, in support of the appeal, that several rulings of the trial court were so prejudicially erroneous that, coupled with the claimed misconduct of the district attorney, the appellant was denied a fair and impartial trial.

[1] It is urged that the trial court abused its discretion in admitting in evidence certain photographs. The photographs had been taken several months after the homicide by a police officer of the city of Sacramento. These photographs portrayed the kitchen where the homicide occurred and indicated the location of certain objects which were in the room at the time of the homicide. Among these objects were the three chairs which were occupied by Mrs. Lebedina, John Sliscovich, and Mrs. Radman. The chairs, for the purpose of the photographs, had been arranged by Mrs. Lebedina, an eye-witness to the shooting, in accord with her recollection of their position on the night of the homicide. Before the taking of the photographs Mrs. Lebedina seated herself in the chair which she had occupied at the time of the homicide. As a foundation for the introduction of the photographs Mrs. Lebedina testified that they were correct representations of the condition of the room on the night of the homicide. The photographs were admitted only for the purpose of illustration in order that the jury might follow the evidence of the different witnesses more clearly. As a diagram or illustration of the premises the photographs were admissible. (*People* v. *Crandall,* 125 Cal. 129, 133 [57 Pac. 785]; *People* v. *Phelan,* 123 Cal. 551 [56 Pac. 424]; *People* v. *Mahatch,* 148 Cal. 200 [82 Pac. 779]; *People* v. *Loper,* 159 Cal. 6, 21 [Ann. Cas. 1912B, 1193, 112 Pac. 720].) It is true that a witness, Hall, testi-

fied that there was another chair in the room and also some
boxes with which the children were playing. Mrs. Lebedina,
being recalled to the stand, admitted that the last-mentioned
articles had been omitted from the photographs. It does
not appear, however, that these articles were essential to
an illustration of the manner and the method of the killing
nor that if they had been included in the photographs the
photographs would have been any more illuminating for
the purpose of illustration. The purpose of the introduction
of the photographs was to show the different doors leading
into the kitchen and also the relative position of the three
persons seated in the room at the time of the shooting.
This was adequately done by the photographs in question,
and for illustrative purposes it was not necessary that the
room should be reproduced with absolute fidelity so as
to include unimportant objects. (*People* v. *Grill*, 151 Cal.
592, 598 [91 Pac. 515].)

It is the contention of the appellant that certain evi-
dence was erroneously admitted and was prejudicial to the
defendant's case. The defense in the instant case was in-
sanity. The defendant, as a witness in his own behalf,
testified in effect that certain things had been told him
which so affected his mind that at the time of committing
the murder he was insane. In this behalf the defendant
testified, and in this he was corroborated by another wit-
ness, Radal, that previous to the night of the murder he
had been told by Radal and by one Kleest that a colored
plasterer was drugged with whisky by the deceased and that
another man had been drugged and robbed of some eighty
dollars by the deceased at her home. Upon this phase
of the case the prosecution called to the witness-stand one
A. J. Miller, who, it was claimed by the prosecution, was
the colored plasterer referred to by the defendant. In
response to the question propounded by the trial court, ''I
suppose you are the plasterer, are you?'' the witness re-
plied, ''No, sir.'' Despite this answer and appropriate ob-
jections interposed by the defense, the witness was per-
mitted to testify, in response to questions by the district
attorney, that he was acquainted with Mrs. Radman, the
deceased; that he had done some paper-hanging and tinting
for her; that while he was working for her he had drunk
some wine with his meals, but that he had never been

poisoned. Upon cross-examination it developed that the witness Miller was not the only colored man who had been working at the Radman's house, but that there had been at least one other colored man working there. Another man, by the name of Mike Rubus, who had been living with Radal, and who had, in fact, lost eighty dollars, testified that he had not been drugged at the home of the deceased and that he had not been robbed of any money there. It was not, however, shown in evidence that the witness Rubus was the man referred to by the defendant as having been drugged and robbed at the home of the deceased.

[2] The test, of course, where the defense is insanity is not whether the facts claimed to have been told to the defendant and relied upon as a cause of the defendant's claimed insanity were true or false. The real test is whether the defendant was in fact told the things which he claimed caused his insanity, and what effect, if any, they had on his mind. The material thing in weighing the defendant's defense of insanity in the instant case was the communication of certain facts to the defendant, and it was entirely immaterial whether the things disclosed to him had or had not actually happened. [3] Obviously, the fact that the things claimed to have been related to the defendant did not actually occur is not proof that the things were not related to the defendant. (*People* v. *Hurtado,* 63 Cal. 288.) [4] Although inadmissible, the evidence complained of was not so prejudicial as to require a reversal. For after all is said and done the testimony given by the two witnesses in question had but little tendency to impair the credibility of the defendant's testimony and that of his witness in corroboration of him. The witnesses introduced to prove that the incidents claimed to have been narrated to the defendant had not actually occurred were not identified by the prosecution as the persons the defendant had in mind. Not having shown that these were the men the defendant had in mind as having been respectively drugged and robbed, it cannot be said that the prosecution succeeded by the testimony of these witnesses in materially impairing the credibility of the defendant and the defendant's witness concerning the statements that had been made to him that two persons had been poisoned and robbed at the home of the deceased. Therefore the error complained of in

this particular cannot be held to be so prejudicial to the defendant and his case as to require a reversal.

Moreover, it must be borne in mind that it was the function of the jury, in addition to determining whether the claimed statements were or were not in fact actually made to the defendant, to determine whether such statements, if they were made, did so affect the mind of the defendant as to render him insane. A review of the evidence upon the entire case, and particularly upon this phase of the case, shows sufficiently, we think, that when the defendant was told that the deceased had poisoned or drugged and robbed two men with whom he was acquainted the defendant did not have in mind "poisoning" or "drugging" in the ordinary sense, but had in mind that the deceased had poisoned or drugged these men by selling them what may be termed "moonshine whisky," and that one of these men had been robbed after indulging in such liquor given him by the deceased. [5] The statements claimed to have been made to the defendant, i. e., that a colored plasterer had been poisoned by indulgence in whisky at the home of the deceased, and that another man who had indulged in such liquor was robbed of some eighty dollars, are not statements of the nature that would ordinarily affect the mind of a man to the point of rendering him insane. And the jury may well have so found, even though they had further found that the statements in question had in fact been made to the defendant. We are satisfied, upon a review of the evidence adduced upon the entire case, that the jury, even if they had believed that the statements had been actually made, would nevertheless have failed to give credence to the defendant's insanity claimed to have resulted from the statements made to him, and that the verdict would have been the same regardless of the evidence complained of.

[6] Complaint is made of alleged misconduct on the part of the district attorney, which, it is claimed, was so flagrant in several instances as to prejudice the defendant in the eyes of the jury. During the course of his argument, and this is complained of, the district attorney made reference to the recent murder of Dr. Arbogast, a prominent physician of the city of Sacramento, and to the murder of Harry Brown, a prominent young attorney of the same city. Both men had been shot down in cold blood, and

at the date of the trial their murderers had not been apprehended. It is argued by the defense that these crimes, because of the prominence of the victims and the brutality of their killing, had created a deep impression on the public mind, and it is insisted that a reference to these crimes necessarily prejudiced the jury against the defendant. The record shows that this misconduct, if misconduct it was, was invited by the counsel for the defense when, in his argument to the jury, he said: "Men are walking to-day on the streets of Sacramento, who shot men down in cold blood, without provocation." The argument of the district attorney, made in reply to this statement, was well within the limits of legitimate reply. The argument of the district attorney having been provoked and invited by counsel for the defendant, it cannot now be assigned and relied upon as misconduct requiring a reversal of the case. (*People* v. *Bush;* 68 Cal. 623 [10 Pac. 169]; *People* v. *Philbon,* 138 Cal. 530 [71 Pac. 650].)

[7] With reference to other portions of the argument of the district attorney wherein it is complained that he was guilty of misconduct in his comments upon the character and personality of a witness for the defense, we cannot say, as is contended, that the district attorney exceeded the bounds of legitimate argument.

Complaint is made of the ruling of the court refusing counsel for the defense permission to cross-examine or ask leading questions of one Mike Brevl, an uncle of the defendant, who was called to the stand as a witness for the defendant. In response to interrogatories which were put to him the witness denied that he had had certain conversations with the defendant concerning the deceased previous to the homicide. This was the sum and substance of his testimony. Counsel for the defendant thereupon announced that he was taken by surprise, in that the witness, a short time before taking the witness-stand, had said that he had had certain conversations with the defendant concerning the deceased previous to the homicide. There was no error in this ruling of the trial court. [8] While it is true that under the provisions of section 2049 of the Code of Civil Procedure a party producing a witness may show that the witness had made statements at other times inconsistent with the testimony as given upon the witness-

stand, still the privilege permitted by this section may not be invoked on every occasion. The purpose of the provisions of this section is to permit a party who has, in good faith, produced a witness upon the stand in the belief that the witness will give certain testimony in support of the party calling him to show that prior to being called to the witness-stand the witness made statements which, if admitted in evidence, would have been favorable to the party calling the witness. [9] But to entitle a party to contradict his own witness by showing statements elsewhere made and contrary to those made upon the witness-stand, it must appear not only that the party was surprised by the testimony of the witness, but that such testimony was prejudicial to the case of the party calling the witness. Therefore, the mere failure of a witness to testify favorably for the party calling him, unaccompanied by any testimony which would tend to the prejudice of the case of the party -calling the witness, will not entitle such party to show that the witness has elsewhere made contrary statements concerning the facts sought to be elicited from him. [10] The witness in the instant case not having testified to anything that was prejudicial to the defendant and the defendant's case, the defendant was not privileged to invoke the provisions of the code section last above referred to. (*Zipperlen* v. *Southern Pac. Co.*, 7 Cal. App. 206, 216 [93 Pac. 1049]; *People* v. *Creeks*, 141 Cal. 529, 532 [75 Pac. 101]; *People* v. *Cook*, 148 Cal. 334, 345 [83 Pac. 43]; *People* v. *Spencer*, 58 Cal. App. 197, 225 [208 Pac. 380].)

[11] The motion to strike out the testimony of the witness Radal to the effect that he had told the defendant that it was foolish for the defendant to go to the home of the deceased and there spend his money "and make him crazy with that liquor" was properly granted. The testimony of this witness evidently came in before an opportunity was presented for an objection by the district attorney, and the motion to strike out was granted upon the ground that the testimony in question had no tendency to prove any of the issues of the case and tended to do no more than to show that the deceased was dealing in the illicit sale of liquor. Surely the belief of the witness that indulgence by the defendant in liquor that might be served by the deceased would make the defendant crazy was not competent

or any evidence of the fact that the defendant was insane at the time of the killing. It may be noted that even if such testimony were admissible, evidence to the same effect and standing uncontradicted in the record was given by the defendant in his own behalf.

The district attorney was permitted, over the objections of counsel for the defendant, to elicit from a witness who was called in rebuttal upon behalf of the people, evidence to the effect that the defendant about ten days before the commission of the homicide was drunk and said he was "going to kill somebody." It is not readily and clearly ascertainable from the record before us just what was the real purpose of the district attorney in offering this particular piece of evidence. But the sum and substance of the discussion by way of argument of the objection interposed by counsel for the defense would seem to indicate that the district attorney insisted that the testimony should be admitted by way of impeachment of the defendant and the defendant's witness Radal, and also that the testimony was admissible by way of rebuttal of defendant's testimony. It was insisted in the court below, and it is now insisted here by the defense, that no foundation was laid for impeachment purposes of either the defendant or the witness Radal, and that the testimony referred to was not in fact rebuttal. [12] Relative to the point that no foundation had been laid for impeachment purposes in so far as the testimony of the defendant was concerned, it may be said that the testimony in question embodied a relevant declaration made by the defendant and was, therefore, pursuant to the provisions of section 1870, subdivision 2 of the Code of Civil Procedure, admissible as an independent piece of evidence and, therefore, there was no need for the laying of a foundation. [13] In so far as the testimony of Radal is concerned we cannot see how the particular evidence in question had any tendency toward the impeachment of that witness. But even though this be so, still the testimony in question was in a measure rebuttal in character and, therefore, admissible. The defendant had testified in support of his defense of insanity that on the night of the homicide "everything turn black" just before the killing. The obvious purpose and tendency of the testimony complained of was to show that the defendant for at least ten days prior to the homicide was bent on murder.

[14] A request was made by counsel for the defendant that an interpreter be appointed to translate the testimony of the defendant and the testimony of the defendant's witness Radal, upon the ground that they did not sufficiently understand the English language. The trial court, however, concluded, and so far as we are able to ascertain from the record, correctly, that there was no need for an interpreter. No complaint is made of the refusal of the trial court to appoint an interpreter. But in view of the claimed difficulty in eliciting answers from the witnesses, it is insisted that the trial court erred in refusing to permit counsel for the defendant to propound leading questions. Leading questions are ordinarily permissible only in the discretion of the trial court. The record shows that even though leading questions were not permitted, the testimony sought to be adduced by those questions was subsequently elicited from the witnesses by the use of simple language. Obviously, therefore, there was no abuse of the discretion of the trial court.

[15] We cannot take seriously the complaint that the trial court refused to permit the defendant, when testifying as a witness, to explain his answers. In the instances complained of the witness had fully and completely answered the questions put to him. The trial court rightfully refused to permit him to explain, upon the ground that he had already fully and completely answered the questions and upon the theory that any explanation would be no more nor less than a volunteer statement.

[16] It is argued that the trial court by its frequent interruptions, of its own motion, of the counsel and of the witnesses for the defense, seriously impaired and impeached the defendant's case. After a perusal of the cold record before us we cannot say that there is any merit in this contention.

We have considered all of the points made concerning the rulings of the trial court where the points have been argued in detail in the briefs and which we consider worthy of discussion. Complaint, however, is made that the trial court in numerous other instances erroneously permitted the prosecution to introduce immaterial matters for the purpose of attacking the credibility of the witnesses for the defense. No argument is made in support of this contention other

than a general reference to the transcript and in one instance no reference is made to the transcript at all. We have nevertheless made an examination of the record and do not find the points last referred to merit serious discussion.

The judgment is affirmed.

Lawlor, J., Waste, J., Seawell, J., Richards, J., and Myers, C. J., concurred.

In denying a rehearing the court filed the following opinion on June 6, 1924:

THE COURT.—The petition for a rehearing is denied. We deem it necessary, however, to say that the original opinion is not to be construed as holding that where counsel for the defendant in his argument to the jury, departing from the record, comments upon facts and circumstances not appearing in evidence in the case, the district attorney will be justified in his reply argument in referring to matters and things which have no substantial basis in the evidence adduced upon the entire case. [17] Manifestly, such misconduct of counsel for the defendant, in any given case, occurring at the trial, or during the argument to the jury, will not suffice to justify similar misconduct of the district attorney.

The argument complained of in the instant case was, in effect, a statement, prompted by a suggestion from counsel for the defendant, that crime, as a result of the lax administration of justice, was on the increase and that juries should do their duty. Such an argument, it seems, would have been permissible even if it had not been prompted by counsel for the defendant. (*People* v. *Molina,* 126 Cal. 505, 508 [59 Pac. 34]; *People* v. *Burke,* 18 Cal. App. 72, 102 [122 Pac. 435].)